### McDADE v. GIRARDY. (No. 817.)

(Court of Civil Appeals of Texas. Beaumont. June 8, 1922.) .

**1. Trial ⬤⟲352(4)—Submission of issue as to whether agent of vendor had authority to execute a contract of sale and not the contract declared on held error.**

In an action by purchaser against a vendor for breach of a contract for sale of land, in which the purchaser relied on a contract executed with him by the vendor's agent, submission of a special issue whether the vendor authorized his agent to execute "a contract in writing for the sale," and refusal to submit an issue as to whether the vendor authorized his agent to execute "the written contract as alleged in the purchaser's petition" was error, where the issue in the case was whether vendor authorized the agent to make the contract declared on by the purchaser in his petition.

**2. Principal and agent ⬤⟲119(2) — Evidence must show authority of agent to make contract relied on.**

In a suit to enforce specific performance of a written contract for the sale of real estate or for damages for breach of such contract executed by an agent, the proof must show that the authority of the agent was such as to permit making the identical contract declared on.

**3. Customs and usages ⬤⟲18, 19(1)—Party relying on a custom to sustain a contract pleaded should allege and prove it.**

In an action by a purchaser against a vendor for breach of contract for sale of land, in which the purchaser relied on a custom to sustain the contract, he should allege and prove the custom.

**4. Customs and usages ⬤⟲12(1)—Vendor not engaged in real estate trade not bound by customs in absence of knowledge thereof and instructions to agent contemplating following customs.**

The customs and usages of the real estate trade as to the kind of contracts made by real estate agents for the sale of property are not binding on vendor unless he has knowledge thereof or the custom is so universal that he is charged with knowledge thereof, and not even then, unless his instructions to his agent contemplate the following of the custom.

Appeal from District Court, Harris County; Chas. E. Ashe, Judge.

---

⬤⟲For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Action by V. F. Girardy against J. M. Mc-Dade. From a judgment for plaintiff, defendant appeals. Reversed and remanded.

Woods, King & John, of Houston, for appellant.

Campbell, Myer & Freeman, of Houston, for appellee.

O'QUINN, J. Appellee sued appellant for $5,000 as damages for an alleged violation of a contract to sell to appellee lot 7 in block 23 of the Montrose addition to the city of Houston, Tex. He alleged.

(1) That appellant, acting by and through his duly authorized and empowered agent, Sadie C. Lee, on April 10, 1920, sold to appellee lot 7 in block 23 of the Montrose addition to the city of Houston for $16,000 cash. That to consummate said sale appellant, acting by and through his said agent, Sadie C. Lee, executed and delivered to appellee the following contract of sale:

"Houston, Texas, 4/10/1920.

"Received of V. F. Girardy the sum of $500 as earnest money to bind the purchase of that certain lot, with brick veneer house thereon, at 820 Harold street in the city of Houston, same being owned and occupied by J. M. McDade, reference being made to the deed records of Harris county, Tex., for more particular description.

"It is agreed herein that the said McDade is to furnish to the said Girardy a complete abstract of title of said property, to date, within 15 days from this date, the said Girardy is then to have 20 days' time from the date of the delivery of said abstract of title to him, to examine the title thereto.

"If the said abstract of title shall show to the satisfaction of said Girardy, a good marketable title to said property in said McDade, then the amount of earnest money herein shall be applied to and as a part of the purchase money herein, to wit: the sum of $16,000.

"If said abstract should not show a good marketable title in said McDade, then he is to have 30 days from the date of delivery of the opinion of Girardy's attorney to that effect within which to perfect said title; and in the event the said McDade should be unable to perfect said title, then the $500 earnest money herein is to be returned to the said Girardy and this contract to be canceled.

"If the title to said property is shown by said abstract to be good in said McDade, and the said Girardy shall fail or refuse to accept same and carry out this contract of sale, then the $500 herein is to be forfeited to the said McDade, as liquidated damages, and this contract terminated.

"Witness my hand at Houston, Tex., this the 10th day of April, 1920.

"J. M. McDade,
"By Sadie C. Lee, Agent.
"I hereby accept the foregoing contract.
"V. F. Girardy."

(2) That by the terms of said sale, appellee was to pay and did, on April 10, 1920, pay to said Sadie C. Lee, agent of appellant, $500 as earnest money, as provided in said contract of sale, which was accepted by said Sadie C. Lee, agent of and acting for appellant.

(3) That just prior to the execution of said contract of sale and payment of said $500 earnest money, appellant told appellee that he would take the sum of $16,000 cash for said lot 7 in block 23, Montrose addition to the city of Houston, which proposition appellee then and there accepted. That said appellant then informed appellee that he (appellee) would have to consummate said sale through Sadie C. Lee, agent for appellant, and that, in pursuance of said statement, appellee did consummate said sale with and through the said Sadie C. Lee, agent of appellant, by executing the contract of sale above set out and paying to said Sadie C. Lee, as agent for appellant, the $500 earnest money, and the said Sadie C. Lee, agent for appellant, then and there promised appellee to deliver to him a good and sufficient warranty deed to said lot, and to deliver to him an abstract of title to said property, as provided in said contract of sale, all of which was made known to appellant in a few hours after said purchase of said lot through appellant's said agent.

(4) That, after the execution and delivery of said contract of sale to him by the said Sadie C. Lee, appellee, on April 10, 1920, then and there demanded of said agent, Sadie C. Lee, the abstract of title provided for in said contract of sale, which she promised to deliver to him. That she immediately called upon appellant and demanded of him the abstract of title to said lot, but he failed and refused to deliver to her the said abstract, and failed and refused to execute a deed to the said property, as provided for in said contract of sale.

(5) That the title to said lot was good in appellant, and that appellee was ready, able, and willing to accept same, and to pay therefor the said sum of $16,000 in cash.

(6) That, after the sale of said lot to appellee by appellant himself, and also by his said agent, Sadie C. Lee, appellant, on April 12, 1920, sold and conveyed said lot to one N. D. Naaman, and thereafter refused to convey said property to appellee as he had contracted and obligated himself to do, and refused to comply with the said contract of sale. That by reason of said sale and conveyance of said lot to said Naaman, appellant is wholly unable to carry out his said contract of sale to appellee of said lot, and therefore appellant is liable to him for damages occasioned by his failure and refusal to carry out his contract of sale, in the sum of $5,000.

(7) That prior to the delivery of the deed of conveyance to said Naaman by appellant, and prior to any contract of purchase between appellant and said Naaman, appellee had paid to appellant's said agent, Sadie C. Lee, the $500 earnest money provided for in the contract of sale, and had demanded the

abstract of title to said lot, and was ready, able, and willing to accept deed from appellant to said property and to pay the contract price, $16,000 cash, but appellant ignored the sale of said property to appellee by appellant and his agent, the said Sadie C. Lee, and refused to comply. therewith.

(8) That on said April 10, 1920, and ever since the said lot 7 in block 23, Montrose addition to the city of Houston was reasonably worth the sum of $21,000. That he (appellee) was to pay and had agreed to pay therefor the sum of $16,000 and that, by reason of appellant's refusing to carry out his contract of sale to appellee, he has suffered damages in the sum of the difference of the market value of said property and said purchase price, which is the sum of $5,000, for which he prays judgment.

Appellants answered by general demurrer, general denial, and specially:

"They deny that the instrument of writing, whereby the defendant, J. M. McDade, and wife, Edna M. McDade, contracted, as alleged in plaintiff's petition, to sell the property involved, which purported to be executed by the said J. M. McDade, through his alleged agent, Mrs. Sadie C. Lee, was executed by the said J. M. McDade, or by his authority, or by the said Edna M. McDade, or her authority; defendants expressly alleging that neither the said J. M. McDade, nor his wife, Edna M. McDade, authorized the said Mrs. Sadie C. Lee, or any one whomsoever to execute a contract for the conveyance of the property involved here"

—which said special plea was duly verified under oath by appellant, J. M. McDade.

The case went to the jury on special issues, upon the answers to which judgment was entered against appellant, J. M. McDade, for the sum of $1,500, from which he appeals.

The controlling issue in the case is whether appellant authorized Mrs. Lee to execute the contract pleaded by appellee. Appellant contends that he did not; that, if she was authorized to execute any contract in writing, she was only authorized to sell the lot, receive the earnest money to bind the trade, and execute a writing binding appellant to convey; that, it being understood by all the parties that the sale was to be an immediate sale for cash, such authority did not empower her to make a contract in writing, binding him to furnish appellee with an abstract of title to the lot or to give appellee 20 days in which to examine the title and make objection thereto. Appellee insists that appellant's instructions to Mrs. Lee gave her full authority to execute the contract pleaded by appellee, and upon which he relies for recovery.

The testimony, in so far as same is necessary to an understanding of the origin and nature of the contract in question is as follows:

V. F. Girardy testified:

"I do know Mr. McDade. * * * I did have a transaction with him in the purchase of a place. * * * Lot 7 in block 23 Westmoreland addition. With reference to what occurred in connection with the transaction between myself and Mr. McDade * * * I think it was Monday morning my wife came to me and said that the McDade property was a nice place and if she could buy it at a price she would like to have it. I told Mrs. Girardy to go to the phone and ask Mr. McDade if he would consider a proposition, an offer, and if he did to make him an offer of $15,000 cash. She went to the phone and phoned Mr. McDade. Then she asked him to come out, which he did. That afternoon he came to the house. * * * I offered him $15,000 cash. He then stated that he would not get very much out of it, that he would have to pay his real estate agent, and so I finally then made him this proposition: I will give you $15,000 cash to you, I will give you $500 cash for your agent. We stood there for a little while and he wanted to know how long he could have for this offer. I said I would like to have it in a few days, like to know if he would accept it. He then left. * * * Saturday morning I received a telegram from Oklahoma. I took the telegram down to Mr. McDade around 10 o'clock, laid it on his desk, and showed it to him and asked for a definite answer. The telegram was about a piece of property in Oklahoma that I was negotiating for and I told him, explained it to him. They wired and wanted to know if I would confirm it. I told him that it was necessary for me to know if he would sell his place to me, that otherwise I would take the Oklahoma property, but if he would sell the place here and let me know definitely, that I would buy his place. It was then about 11 o'clock in the morning, Saturday. * * * He told me then to come down to his office at 4 o'clock that afternoon. I went down at 4 o'clock. He was a little busy. About 20 minutes afterwards he called me in. He then stated that he had some rugs, a carpet on the stairs, and tapestries and window shades and so on that cost him about $500, and that they would be practically no good to him, but ought to be left intact in the house. I agreed then to give him $500 for the place, for the carpets, rugs, and draperies, which would make the place then cost me $16,000. I agreed to add $500 more to the purchase price, making it $16,000 in all. He then told me he would accept it, but I would have to buy through his agent. He then took the phone and called up his agent. At that time I didn't know who his agent was. I don't think he told me who his agent was at that time. I am not sure whether he mentioned names at that time. I wasn't paying particular attention to who the agent was. While he was phoning I stepped on the outside of the office and went and sat in the south side of his garage in my car, and he came over and sat down by the side of me and he said: 'Mr. Girardy, you have bought a place,' and then he said: 'Mrs. Lee will get to you immediately and sell it to you for $16,000.' Then it was about 5, maybe a quarter after 5 in the evening. * * * The same afternoon he told me Mrs. Lee would take up this matter with me, and that I would have to close up with her. He told me himself she was his agent. I was ready and willing to pay the $16,000 for the property. I have been all along ready and

willing to pay for the house. As to the title to that property, will say that I did demand an abstract of title. It was not furnished. I have never been furnished with an abstract of title. In fact, have never seen it. I asked for it that very evening that I secured this earnest receipt. As to whether Mr. McDade himself ever told me why he didn't furnish me an abstract and deliver me a deed to the property, will say that Mr. McDade never told me anything after that. * * * As to whether or not I remember hearing what he told Mrs. Lee, whether I heard him talking to Mrs. Lee over the phone that evening, will say I heard the major portion of his conversation. I heard him tell her when she would have to sell the house; she would have to sell it between then, about 5 o'clock Saturday evening, and 2 o'clock Monday. I heard him give her until 2 o'clock Monday to sell the house. At that time he told her two or three prices. He phoned her she could sell it for $18,500; that she could sell for $17,500, or could sell for $16,000. I heard him tell her that. I heard him tell her to sell by 2 o'clock the following Monday evening; that if it wasn't sold by 2 o'clock Monday that he was going to take it out of her hands; those were the very words he used. * * *"

On cross-examination:

"* * * He told me that he would sell it to me for $16,000, and that Mrs. Lee was his agent and that I would have to buy it through her. * * * Mr. McDade told me that he would accept the proposition of $16,000, but that I would have to see Mrs. Lee. She would close the deal, the transaction, as she was his agent. In view of the fact that she was his agent, she would close the transaction. * * * It was a cash consideration. * * * I didn't hunt up Mrs. Lee. She phoned to me and came out to my house. * * * Mrs. Lee didn't get to my house until after 7:30, will say it was after 7:30, just as soon as I could get up and get in the car and arrange matters with Mrs. Lee the contract was made. * * *"

Mrs. Sadie C. Lee testified:

"I was in the real estate business last April selling real estate for parties, clients, in the city of Houston. I do know Mr. McDade. He did put property in my hands for sale. * * * I had it for about two months, maybe more. It is the same property involved in this suit. I am the Sadie C. Lee that negotiated with Mr. Girardy for the sale of that property. * * * As to the date when I took it up with Mr. Girardy, well, I called up Mr. Girardy on the 10th of April, but I had never seen Mr. Girardy up to that day. I had taken his wife there. I took Mrs. Girardy there on one occasion before that, and showed her the house. But the day I took it up with Mr. Girardy, I remember the day that was. It was the 10th of April and on Saturday. I think I remember all the circumstances of my having taken that up with Mr. Girardy. As to all that took place between me and Mr. McDade, will say the following: My telephone rang about 4 o'clock. I went to the phone and it was Mr. McDade. It was some time in the afternoon and he told me he wanted me to sell his house and wanted to know if I could sell it that evening. Why, I said: 'That's an impossibility; I can't sell it

this afternoon.' Well, he said: 'You will have to sell it this afternoon; get busy now and sell it,' and I said: 'Mr. McDade, this is Saturday afternoon, and I can't sell it,' but I told him I would do all I could. He said: 'Get busy and sell it.' I could hear him pound the table over the telephone. I asked him to give me until Monday at 10 o'clock, and he said, 'Well, he didn't want to do that, didn't want to give me until 10 o'clock,' and I said: 'Then I won't try it.' He says: 'Well then, I will give you until 2 o'clock Monday.' * * * He told me what time I could sell the place for $16,000. He said until Monday 2 o'clock. * * * I was authorized by Mr. McDade. He told me when I got the earnest receipt, Mr. McDade told me to tie the man up good. He says: 'You tie up whoever you sell to,' and so I tied him up. I tried to. * * *' This is the paper that was signed (referring to receipt for earnest money). Mr. McDade told me to tie them up. He told me to get the earnest money and tie them up so that there would be no come back on it; but I don't remember his words exactly. I know he said: 'Get the earnest money, and tie them up.' He didn't say any contract, earnest money receipt, or anything. He said: 'Get that earnest money, get it to-night if you can, and tie them up.' That was that very evening somewhere around between 4 and 5. I don't know what time, but I know it was in the afternoon. * * *"

On cross-examination:

"* * * And he said I could sell it. And he finally limited me until 2 o'clock Monday to sell it, and told me to tie up the buyer—whoever I sold it to, to tie them up. He said: 'Tie the buyer up. Get that earnest money, get it to-night if you can'; and I got it. He said to get all the earnest money I could. He didn't fix the exact amount of earnest money. He never did tell me any amount; he told me to get all I could. I can't remember him telling me anything else except that he told me to get busy and go right after my buyers, and I did it. As near as I can recall, his exact words were 'tie them up. Get the earnest money.' Get all I could and tie them up, and that is what I did. He said: 'Get that earnest money and tie them up.' He didn't say: 'Get any contract from them,' but said tie them up and of course I had to have an earnest money receipt. * * * Mr. Girardy wanted a receipt and I gave it to him. * * *"

Mrs. Sadie C. Lee, being recalled, testified:

"I did hear Mr. McDade's testimony yesterday. Mr. McDade never in his life said to me in his house or anywhere else that I did not have authority to sell the lot, that he only asked me to get the best offer I could get for it. * * * My understanding was I was to sell the place and that I was to have until 2 o'clock Monday to sell it. Mr. McDade didn't say anything to me in the conversation over the phone that evening when he told me to sell it as low as $16,000 cash, if I couldn't get any more, he didn't say to me that if somebody didn't bid higher. There was no understanding about anybody bidding a higher price. He didn't tell me that anybody else was representing him in making the sale. I was the only agent he had

it with. * * * He always told me I was the only one who had the house for sale."

J. M. McDade testified:

"I do remember the Saturday that Mrs. Lee has been testifying about. I do remember Mr. Girardy being in my office that Saturday afternoon. He was in there the last part of the afternoon. I remember calling Mrs. Lee. I phoned Mrs. Lee. Mrs. Lee was a real estate agent with whom I had this property listed, only listed. * * * On the Saturday I had spoken of, Mr. Girardy was in my office. He came to see me. As to what he offered for the property, after some little discussion he offered $16,000. I told him we were going to sell the property real soon because we needed the money to invest in other property to build a little place to transact business in. And we were going to sell to the highest bidder and we had several prospects to buy the place, and if he wished to submit his bid on the place, to submit the bid to Mrs. Lee. Mrs. Lee had talked to me about Mr. Girardy and Mr. Girardy was Mrs. Lee's prospective buyer. Now Mr. Frank Hammon had spoken to me about several prospects. Mr. Edwards had a prospective buyer. Mr. Lee Craft had a prospective buyer, and we wanted to sell it and the last few days before it was sold we decided to sell to the very best possible bidder, and I suggested to Mr. Girardy to transact his business through Mrs. Lee as all other agents had their prospects. * * * I wanted the bids to come in that we were going to accept, to come through the agents, because the agents would have to receive their commission. I told Mr. Girardy that. I referred Mr. Girardy to Mrs. Lee, and I also phoned Mrs. Lee and asked her to see Mr. Girardy and secure from Mr. Girardy his best price as a bid on this property as the property was going to be sold very soon, and for that reason the best bid would be considered. I certainly mentioned the different prices of $18,000, $17,000, and $16,000. I mentioned the prices to Mrs. Lee. As to whether or not it was in Mr. Girardy's presence, I suppose he heard the conversation. I did not tell Mr. Girardy that I accepted his $16,000 offer and would sell on that price. I don't recall telling him that I accepted his $16,000 offer, but that I didn't want Mrs. Lee to know it. I didn't accept his offer at any time. He offered $16,000 for the property, and after considerable conversation throughout the entire afternoon, I asked him if that was his best bid on the property, and I reminded him that Mrs. Lee was the agent, his agent, rather our agent, and I asked him to submit to Mrs. Lee the very best bid on the property, as there were other bids coming in, and we would accept the best bid later on. Mr. Girardy's testimony is absolutely correct when he says that over the telephone I mentioned three or four prices to Mrs. Lee. It happened just exactly that way. We intended to sell the place. We held it for $20,000 for a couple of months, and we needed our money to invest in something else, and we needed it quickly, and in order to get it we thought we would reduce the price. I knew there were several good prospective buyers, and I rang the different agents. I was trying to help sell this property, and I asked them to get the best bids they could on the place, as we wanted to sell it within the next day or two. That was Saturday. I also rang Mrs. Lee and asked her to get the best offer from Mr. Girardy. That was after I had talked to Mr. Girardy, and Mr. Girardy had persisted all afternoon to close some sort of deal on the $16,000 basis. I didn't have to close the deal on that basis, as I thought other bids would probably be better. We determined to take what bids were offered and whichever was the best, if we didn't get more than one or two or three, to close it on the best bid, and in fact —we were going to close Monday. * * * We needed our money and for that reason the best buyers * * * the best bid we were going to accept, and that was understood by the different agents. Mr. Edwards fully understood—I told Mrs. Lee that also. I asked her for the best possible bid to sell the property. I asked her to secure the best bid possible to get from Mr. Girardy there; that Mr. Girardy had offered a $16,000 bid, which I wasn't in a position to handle, but which possibly might be accepted, if his bid was the best by that time. The only thing I ever asked Mrs. Lee was to submit the best bid she could secure from Mr. Girardy. I don't think that we could have handled it more businesslike. We wanted to sell our place and needed our money pretty badly and were going to sell it to the best buyer. The best bid we got was $17,500. We sold it."

On cross-examination:

" * * * I advised her to see Mr. Girardy at once and get his best offer as he had been down to see me during the afternoon, and persisted in paying $16,000 for the place. I asked her to go over and see Mr. Girardy and get his best offer and to raise his bid. * * * We are going to sell to the best possible bidder and there were several buyers looking at the place to buy it. Mrs. Lee was not my exclusive agent by any means. * * * As to whether I told Mrs. Lee over the phone Saturday evening that Mr. Girardy had offered me $16,000, will say that I am sure that I told Mrs. Lee that Mr. Girardy was at my place and that he had made an offer for the place, and to go see him and secure his best possible bid. I am sure that I told Mrs. Lee that Girardy had offered me $16,000 for the place. I asked her to get him to raise his bid if possible. * * * I phoned to her and asked her to get the best possible bid on it, that we were going to sell. * * * I asked her to get a little better offer out of Mr. Girardy if she could. * * * "

[1] In his charge to the jury, the court gave as special issue No. 2 the following:

"Did the defendant, J. M. McDade, on April 10, 1920, authorize Mrs. Sadie C. Lee, in the event she made a sale of the lot and improvements, to execute a contract in writing for such sale? Answer, 'Yes' or 'No.' "

—to which the jury answered, "Yes."

Appellant objected and excepted to the giving of said issue, and requested the court to submit the following:

"Special Requested Issue No. 2.

"Did J. M. McDade, on or about April 10, 1920, authorize Mrs. Sadie C. Lee to execute the written contract set out in plaintiff's peti-

tion, for the said McDade, selling the property involved to V. F. Girardy? Answer 'Yes' or 'No.' "

—which the court refused to give.

In refusing to give the above special charge, we think the court committed error, for which the case will have to be reversed. Appellee, plaintiff below, founded his cause of action on the contract pleaded by him. It was the material issue in the case, and appellee's sole right to recover was based thereon. The special issue No. 2, as given by the court, was not responsive to the plaintiff's pleading, and we think was error. Special issue No. 2 requested by appellant was directly responsive to the asserted cause of action, and should have been given. The issue, as submitted by the court, "Did the defendant * * * authorize Mrs. Sadie C. Lee * * * to execute a contract in writing?" was too general and would have authorized the jury to answer against appellant on any contract whatever, without regard to the terms or conditions set out in the one alleged to have been actually executed, or whether same was in accordance with the authority actually conferred. The question was not whether McDade authorized her to make "a contract in writing," but was whether he authorized her to make the very contract declared on by appellee in his petition. That was the contract he relied upon, and he should not be allowed to recover on any other. Articles 1971, 1984a, 1985, Vernon's Sayles' Civil Statutes.

[2] In a suit to enforce specific performance of a written contract for the sale of real estate or for damages for the breach of such a contract executed by an agent, the proof must show that the authority of the agent was such as to permit the making of the identical contract declared on, and not one differing therefrom in any material respect. Spengler v. Sonnenberg, 88 Ohio St. 192, 102 N. E. 737, 52 L. R. A. (N. S.) 510, Ann. Cas. 1914D, 1083; Evants et al. v. Fuqua, 102 Tex. 430, 118 S. W. 132, 132 Am. St. Rep. 892; Downing Investment Co. v. Coolidge, 46 Colo. 345, 104 Pac. 392; Van Winkle v. Harris, 137 Ga. 43, 72 S. E. 424.

Appellant contends that the only authority Mrs. Lee had was to make an immediate sale of the property for $16,000 cash, and that under that authority all she was required to do or was authorized to do was to make the sale for $16,000 cash, receive the earnest money to bind the trade, and execute a contract binding her principal to convey; and that same did not confer upon her any implied or incidental authority to bind her principal to furnish appellee an abstract of title or to give him 20 days in which to examine same and make objections thereto.

To this appellee replies that—

"the question of whether or not the identical contract of sale executed by Mrs. Lee for ap-

pellant was the one. appellant authorized her to make was not the issue in the case, but the issue was whether or not appellant had authorized Mrs. Lee to close the sale of the property for $16,000 cash, and to execute the usual form of contract in writing for the sale of real estate."

Appellee insists that—

"the contract of sale that was executed by Mrs. Lee for appellant was in the ordinary and usual form such as is customarily used in closing up sales of the kind involved in this suit, and under all the circumstances she was fully authorized to obligate appellant to furnish an abstract of title and allow 20 days to appellee to examine and approve same."

[3] Appellee relies upon the rule of custom, that is what is usually and customarily done in such matters, to sustain his contention as to the contract executed by Mrs. Lee as the agent of appellant. Even if this be the rule, which we do not determine, appellee failed to either allege or prove any such custom. If he had intended to rely upon such rule to sustain the contract pleaded and as a basis for recovery upon said contract, then he should have alleged and proven same. Moore v. Kennedy, 81 Tex. 144, 16 S. W. 740; Green v. Hill, 4 Tex. 465; Daugherty v. Leewright (Tex. Civ. App.) 174 S. W. 841; Brady v. Richey & Casey (Tex. Civ. App.) 187 S. W. 508; Lasater v. Poage (Tex. Civ. App.) 239 S. W. 319; Staskey v. Smith (Tex. Civ. App.) 240 S. W. 1032.

[4] Further, we think that as it was not alleged that appellant was engaged in the real estate business, the customs and usages of that business would not be binding upon appellant, and enter into the contract alleged to have been made by him through his said agent, unless it was alleged and proven that he had knowledge of the custom relied upon or that the custom was so general or universal that he was charged with knowledge thereof. Johnson & Moran v. Buchanan, 54 Tex. Civ. App. 328, 116 S. W. 877; Brady v. Richey & Casey (Tex. Civ. App.) 187 S. W. 508; Holder v. Swift (Tex. Civ. App.) 147 S. W. 691; Staskey v. Smith (Tex. Civ. App.) 240 S. W. 1032. And not then unless it is also shown that his instructions to Mrs. Lee contemplated the following of such custom. Proof of such a usage is admitted, not to enlarge the powers of the agent, but only to show the extent of the powers actually conferred. An agent is not within his authority in following a usage or custom in contravention of the known limitations which his principal has conferred upon the agent's authority. 31 Cyc. 1331.

There are other questions presented, but, in view of another trial, we do not consider it necessary or proper to discuss them. For the error discussed, the judgment is reversed, and the cause remanded.